## No. 1051.

### KATIE E. GORDON, TUTRIX, VS. F. P. STUBBS.

In cases of verbal contracts, the declarations of the parties, or either of them, made at the time of entering into the contract. are not to be viewed as admissions, but as direct proof of the contract itself, and therefore do not come under the rule that the admissions of a party are the weakest kind of evidence; which rule is applicable only to admissions respecting the contract subsequent to the making of it. Such subsequent admissions are properly received in evidence to establish the contract and the obligation or liability of the party sought to be bound by it, but it does not follow that the declarations of such party in his own favor, made out of the presence of the other contracting party, going to disprove the contract and his liability under it, are equally admissible. The latter are not admissible, and this rule applies whether the party is living or dead when such proof is offered.

Where one having a claim against a railroad company, fearing its total loss, owing to existing complications resulting from judicial proceedings then pending, proposes to another creditor of the company to try and effect a certain settlement by which it was believed that the threatened loss could be averted, and agreed that, if the settlement was effected by a time stated, the other creditor effecting it might take his claim for a sum named, and the party to whom the proposition is made proceeds to give his time, money and efforts to make the settlement and does accomplish it, he thereby becomes the owner of the claim, subject to the payment of the sum agreed upon.

The party proposing cannot revoke his offer after the settlement is effected, or whilst the other is taking steps to effect it; nor does the death of the party making the proposition before the time fixed arrives, or the amount agreed on is paid over to him, avoid the contract. His legal representative, after his death, is equally bound; and after the sum stipulated is paid to such representative, he cannot maintain an action for the difference between the face value of the claim and the amount so paid.

APPEAL from the Fifth District Court, Parish of Ouachita. *Richardson*, J.

---

*John T. Ludeling* for Plaintiff and Appellant:

1. Admissions of one, since dead, made under circumstances which make it impossible to convict the witness of perjury, not admissible. 7 Rob. 112, Suc. of Segoud.

2. Admission of a person who has died since the alleged declarations, if admissible, are the weakest kind of evidence, and entitled to very little if any weight. 10 La. 355; 7 A. 763; 10 A. 279; 8 A. 278, 279; 8 A. 275; 7 Rob. 112.

3. Such admissions must be corroborated by other and independent evidence. 16 A. 167; 6 A. 763; 1 Greenl. fec. 124.

4. Admissions made out of the presence of the other party inadmissible. 5 La. 414; 11 A. 503; 12 A. 179; 21 A. 620.

5. If the admissions of one who has died since the alleged declarations were made, be received against his representative, it is but reasonable and fair that the declarations on the same subject, made by the deceased, be received in favor of his representatives in rebuttal. 7 Rob. 112, 113; 2 Rob. 301; 16 A. 168.

6. In all contracts there must be something proposed by one and accepted by the other, to form the matter of such contract; the will of both parties must unite on the same point. C. C. 1800. The acceptance, to form a contract, must be in all things conformable to the offer. Any condition or limitation contained in the acceptance of that which formed the

40

matter of the contract, gives him who makes the offer the right to withdraw it. C. C. 1805; 1 La. 190.

7. The modification or change of the proposition is, in all respects, considered a new offer and a rejection of the first. C. C. 1806, 1808; 1 La. 190; 6 La. 218; 13 A. 419.

8. If the party making the offer dies before it is accepted, the representatives of the party are not bound. C. C. 1810.

9. The *onus* of proof is on the defendant when he affirms he bought notes, etc. *"Ei incumbit probatio, qui decit, non qui negat."* Henn. Degest Evidence VIII, No. 4.

### *Boatner & Liddell* for Defendant and Appellee:

The proposition by Gordon to sell Stubbs his claims against the N., L. & T. R. R. Co. was a continuing offer, giving Stubbs the option to buy on the happening of the conditions implied in the offer. Such proposition required no formal acceptance. The offer of payment within the time stated concluded the contract. Willard vs. Taylor, 8 Wal. 557; Kent, Vol. II, p. 477, sec. 4, and notes; Story on Sales, sec. 127; Pothier on Sales, sec. 31, and notes.

A proposition authorizing action on the conditions expressed, needs no other acceptance to bind the proposer than the act called for by the proposition, and such action will create a valid contract between the proposer and person acting upon the proposition. 7 A. 345; Kent, Vol. II, p. 477, sec. 4, and notes; 9 How. 490. And the contract thus formed is not defeated by the death of either party.

Any contract not expressly required by law to be reduced to writing may be legally made by parol agreement, and parol evidence is admissible to establish it, regardless of amount or value involved. C. C. 2277.

Proof of what was said by parties in making a parol agreement is not proving the declarations or acknowledgments, but is direct evidence of the contract itself.

Declarations or acknowledgments in conversations, denounced by the decisions of this Court as the weakest evidence and entitled to no weight when uncorroborated, are those made to third persons not parties to the agreement or contract, and are not to be confounded with what is said in making a verbal agreement.

*Ex rei necessitate*, the parol agreement can only be proved by what was said in making it.

There is no rule of evidence excluding parol evidence of an agreement with a person since deceased, when the contract proved is one not required by law to be in writing. C. C. 2278. par. No. 2, constituting the only exception in which declarations or acknowledgments of party deceased cannot be proved.

The declarations or acknowledgments of parties are always admissible against them; never in their favor, except as part of *res gestæ.* Greenleaf, Vol. I, sec. 171; 5 N. S. 694, 7 La. 207; 12 A. 179.

The heirs or legal representatives in this suit occupy exactly the position of the deceased. No evidence which he could not use, if alive, is available to them. They can no more use his declarations in his own favor than he could if living. 11 A. 503.

All things being equal, positive testimony on a given point must predominate over negative testimony on the same point. 33 A. 796; 2 A. 1007; 12 A. 127; 7 A. 441; 13 A. 38.

" Where the evidence is contradictory, the verdict of juries of the vicinage upon questions of fraud and the credibility of witnesses, and other matters of fact peculiarly within their province, will not be disturbed unless manifestly erroneous; particularly when sanctioned by the concurring opinion of the district judge. So the opinion of the judge *a quo* upon questions of fact, he having had an opportunity of seeing the witnesses and hearing the testimony, is entitled to great weight and will be affirmed unless clearly wrong. Authorities collected: Hen. Dig., appeal 9 (6), No. 1, p. 92; also, C. C. art. 1928.

### *W. W. Farmer, E. D. White* and *C. J. Boatner* on the same side.

The opinion of the Court was delivered by

TODD, J. This suit is brought by the legal representative of the Succession of Wm. R. Gordon, deceased, to recover of the defendant $24,652 07, with intersst.

The cause of action set forth is substantially as follows: It is alleged that Gordon, at the time of his death, which occurred on the 15th February, 1880, was a creditor of the North Louisiana and Texas Railroad Company for $67,520 07, for which he held the notes of the company. That in a suit in the Federal Court, entitled Henry R. Jackson vs. The Vicksburg, Shreveport and Texas Railroad Company, a judgment had been rendered in favor of the first-named company for $365,000 and interest. That this judgment and certain bonds of the N. L. & T. R. R. Co. had been transferred to the defendant and Geo. C. Waddell in satisfaction of the debts of that company, which they claimed to hold and control. That the defendant, Stubbs, had received the amount of said judgment and had retained out of it the amount that was due Gordon by the company, claiming at the time that he had had an agreement with him (Gordon) respecting the same. That the defendant, after Gordon's death, paid the plaintiff $43,000 in cash, but declined to make any further payment. It is charged that the representations of the defendant respecting the alleged agreement with Gordon were fraudulent, and the sum claimed and for which judgment is asked is the difference between the amount paid and the amount of Gordon's claim against the company.

The defendant, after a general denial, averred, in substance, that Gordon had agreed to sell him his claim against the railroad company for $45,000 if he (defendant) could accomplish a certain result, by which it was believed that an apprehended event and complication could be avoided, the happening of which might cause an irreparable loss to the creditors of the company. (This is set forth at length in the answer and will be more fully explained hereafter.) That the desired result was accomplished, and that very soon thereafter he (defendant) paid over to plaintiff (Gordon having died) the said sum of $45,000—$43,000 in cash and the balance in accounts for sums paid for Gordon. That for this payment plaintiff had given her receipt.

There were two trials by jury. In the first, a verdict was given against the defendant for $9121 66. A new trial was granted, and at this next trial there was a verdict against the defendant for $475; and from the judgment thereon this appeal was taken by the plaintiff.

It is necessary for a full understanding of the issues in the case and of the several questions relating to this controversy, that we should give a brief relation of the facts out of which the same has grown.

In 1866, an association of individuals was formed for the purpose of purchasing the Vicksburg, Shreveport & Texas Railroad, to be sold under a proceeding to foreclose one of the first mortgages on the road. Wm. R. Gordon and the defendant, Stubbs, were both members of this association. The road was purchased and the association was afterwards incorporated under the name of the North Louisiana and Texas Railroad Company, with John F. Ludeling as president.

Suit was soon after instituted by the bondholders of the old company to annul the sale mentioned, and after a protracted litigation, in 1874 a decree was rendered by the Supreme Court of the United States annulling the sale and restoring the title to the road to the Vicksburg, Shreveport and Teaxs Railroad Company. Upon further proceedings in the case, the decree was so modified as to allow the purchasers at the sale thus annulled to make proof of the improvements or betterments made upon the road subsequently to their purchase, which betterments were finally fixed by a decree at $365,000. This judgment for betterments was afterwards seized by a creditor of the North Louisiana and Texas Railroad Company, and third oppositions were filed by other creditors claiming privileges; and a suit instituted by the State in which the president of the company was enjoined from disposing of said judgment or the funds realized from its execution, the State claiming judgment for $1,120,000, with privilege upon the proceeds of the sale.

In December, 1879, the road was sold in accordance with the decree, and by the terms of the sale the purchasers were required to pay $60,000 in cash, to assume the payment of the judgment for betterments, to be paid into Court by the first of the following March; and the balance of the price also to be paid in cash, unless the mortgage creditors were the purchasers. On the 12th of February, 1880, a receipt was given by J. T. Ludeling, president of the N. L. & T. R. R. Co., to F. P. Stubbs, defendant, acknowledging payment and satisfaction in full of this judgment for betterment rendered in the case mentioned. This receipt was not predicated upon an actual payment in cash of the judgment in question, but was executed for the purpose of enabling the defendant, Stubbs, on the faith of it, to obtain money sufficient to pay off all the creditors of the company. The amount of this judgment was $365,000, as stated. The amount of the debts against the company exceeded

$400,000. The principal and largest creditors were Ludeling, Stubbs, Waddell and Gordon. The plan of settling the judgment was for the defendant, Stubbs, with the co-operation of Waddell, to buy up the claims of all the creditors of the road to whom the money realized from the execution of the judgment would have to be paid, and to tender these claims in satisfaction of the judgment. It was termed an advance payment or settlement, and by means of the understanding had between Stubbs and Ludeling, the president of the company, and the receipt or acquittance given, an arrangement was effected by which a member of the new company which had bought the road in the December preceding and had assumed the payment of this judgment, advanced to Stubbs the money to take up the claims against the company, and by presenting them as representing so much money and having them thus recognized, effected the advance settlement agreed on. This plan of settlement, it was believed, would avoid the effect of the injunction by the State referred to, the object of which, as stated, was to reach the fund to be realized from the payment of the judgment and appropriate it to the claim of the State against the company in the pending suit. The notes representing Gordon's claim against the company were, all except one, in the hands of Ludeling at the time of this settlement· Stubbs, in paying Ludeling's claim and others controlled by Ludeling, declined to pay Gorden's, stating to Ludeling at the time that he had had an understanding with Gordon about the settlement of his claim, and gave his obligation to make this settlement to the satisfaction of Gordon on his return to Monroe—the parties being then in New Orleans.

Stubbs left for Monroe immediately after the occurrences stated, and before his arrival there learned that Gordon had died on the 15th of February, being the day of his (Stubbs') departure from New Orleans. In a few days thereafter, Stubbs obtained from Vicksburg the remaining note of Gordon against the company, where it had been pledged, and paid over to the plaintiff as his legal representative, $43,000 in cash, accounted for $2000 more by tendering receipts for amount paid to redeem the note in pledge mentioned, a receipt of Ludeling for amount paid him on account for Gordon, and his (Stubbs') receipt for amount of Gordon's assessment for the fee in the State case referred to; and took plaintiff's receipt for $45,000, the amount which he stated he was to pay Gordon under his agreement with him. The terms of the receipt did not, however, conclude all demand on account of such claim.

Then followed this suit, which, as we have stated, is to recover the difference between the cash paid to the plaintiff and the full amount of Gordon's claim against the company.

From the statement made of the facts bearing on the controversy, it can be seen that it is narrowed down to the single issue whether there was such an agreement between the defendant Stubbs and Gordon as enabled the former to become the owner of the latter's claim against the railroad, upon the payment of $45,000.

That is partially an issue of fact, over which a vigorous and protracted contest has been made and a large amount of testimony, and conflicting testimony, taken, to the discussion of which we will now address ourselves.

After the judgment of the Supreme Court of the United States annulling the sale of the railroad, and the subsequent proceeding taken by the State and the creditors of the company to reach and appropriate the funds to be derived from the judgment for betterments, great depression existed among the members of the company, and alarm lest the fund should deprive them of any benefit therefrom and prevent its being made available to satisfy their several claims against the company. It was generally conceded that, unless some expedient was found to avoid the effect of these measures, the result feared would inevitably follow. It is certain that both Gordon and the defendane, Stubbs, shared this apprehension and realized fully the precarious condition of their claims.

This was the situation of affairs when the idea of this advance settlement of the judgment was suggested, and the defendant undertook to consummate it in the manner stated by controlling the claims against the company, and finally succeeded in doing so, as stated. Stubbs testifies that pending this situation of affairs, Gordon proposed to him in these words: "Arrange to secure the advance payment of the money for the judgment lien, and all my claims will be yours if the $45,000 is paid me before the 1st of March." His testimony is corroborated by Geo. C. Waddell, who states that he was present on two occasions when such a proposition was made—once in Monroe and again in New Orleans—and that subsequently, on his return from the latter city, Gordon joined him on the train, spoke of the proposition he had made to Stubbs, and was urgent that Stubbs and himself (Waddell) should proceed to carry out the arrangements necessary to secure the advance payment contemplated. Their testimony is corroborated by McGuire, the treasurer of the company, who stated that upon reporting to Gordon that Stubbs had said that he could get his claim for $40,000, the former replied that Stubbs had his figures—$45,000. By Shelton, who states that he was present at part of a conversation between Gordon and

Stubbs, in Monroe, at which the former stated "that he was perfectly willing to take $45,000 for his share." By Ray, who testified that he heard Gordon say to Judge Baker "that he would take $45,000 for his claim," and "wipe his hands of the whole thing," and at the same time express his disappointment at the result of the litigation about the road.

It is urged by counsel for plaintiff that all this evidence is but evidence of the declarations of a deceased person and, therefore, inadmissible; and if admissible at all, is to be regarded as the weakest kind of evidence.

If received solely as the declarations of a deceased person they would not be inadmissible, although they would, under a well-known rule of law, be considered the weakest kind of evidence, but there is no legal principle which would absolutely exclude them.

With respect, however, to the testimony of Stubbs, part of Waddell's and Shelton's, the rule invoked does not apply. It was certainly competent to make such an agreement as the one in question, verbally; and if thus made, it could only be proved by parol, unless subsequently acknowledged in writing. Those who were present at such agreement, and saw and heard the parties making it, are not to be classed as witnesses who merely testify as to admissions of one or both of the parties respecting the contract subsequently to the making of it. The distinction is obvious and well recognized. The one proves the contract or agreement—the fact of the making of it—the other the simple acknowledgment that it had been made.

The effect of this evidence is, however, sought to be destroyed by proof of the acts and declarations of the deceased opposed to the theory of the defense, as presented by the pleadings and evidence. A part of this evidence was objected to and excluded, and we think properly. The counsel for plaintiff contends that these declarations thus rejected were upon the same footing as those offered by defendant and received. We do not think so. If Gordon were alive and had brought this suit, and the defendant had pleaded this same agreement to exonerate him from the liability charged, whilst he, defendant, might establish such agreement by parol and prove the admissions of Gordon in corroboration of it, it could hardly be pretended that Gordon would be entitled to prove declarations made by him in his own favor from time to time out of the presence of Stubbs, either denying the existence of the contract, or contradicting its terms, or exculpating himself from liability

under it. The rule is not varied by the fact of Gordon's death. His legal representative suing occupies the same position and is subject to the same rule.

The testimony on this point, not excluded, is of a negative character, and designed to prove a state of fact opposed to the verity of the statements of defendant's witnesses, as by showing the silence of Gordon to those to whom he would most likely have spoken on the subject, and thereby induce the conclusion that no such agreement was ever made. That it was not told by Gordon to Judge Ludeling, who was his friend and confidential adviser and had in his possession Gordon's notes against the company, might seem strange except for the fact sworn to by Stubbs, that for reasons unnecessary here to mention, Gordon had pledged himself not to speak of the understanding between them to Ludeling. We do not think this opposing evidence is sufficient to overthrow the positive sworn statements of the defendant and Waddell to the existence of this agreement, and the testimony of the other witnesses referred to corroborating them.

The next matter urged in rebuttal of defendant's proof on this point, is the letter of Stubbs to McGuire, of the 11th of February, 1880. This letter of itself, standing alone and unexplained, does at first blush seem inconsistent and in conflict with the statements of defendant touching the alleged agreement; but as explained by his testimony and viewed with reference to the "situation" of affairs at the time it was written, we cannot give to it the importance and effect contended for by counsel.

Gordon's proposition to Stubbs, as stated, was that Stubbs was to secure the advance payment of the judgment for betterments, or judgment lien as it was termed, and if $45,000 was paid him by Stubbs by the 1st of March, the claims were to be his—Stubbs'. It is very evident from the circumstances then existing that it was well known or believed by both parties that Stubbs would only be able to pay this $45,000 if he could effect this advance payment of the judgment, and he had until the 1st of March to do this and to pay the amount stated to Gordon. Whether he could make the contemplated arrangement was then involved in the greatest uncertainty, and whilst this uncertainty continued he could not tell whether he would be able to raise the required amount or not. At the time he wrote the letter to McGuire, this uncertainty had not been removed. He tried to get the money from Richardson and failed, and tried to procure from Ludeling a partial acquittance of the judgment to the extent of his own claim and that of Waddell and had failed. He was satisfied that without an

entire acquittance of the judgment from Ludeling there was no prospect of raising the money, and he had no reason to believe, from his recent experience, that he could obtain the acquittance without an actual payment of the money.

Under these circumstances, he sought to provide for a contingency that then seemed impending—of a failure to secure the advance payment and a failure to get the $45,000 to pay Gordon—and sought, in the event of such failure, to obtain the claims of the creditors on other and more favorable terms. This is the construction we place on the letter, under the explanation and evidence afforded by the record. And viewed in this light, it does not establish that Stubbs had abandoned his undertaking to procure the contemplated settlement, or that he had declined, in the event that that was still possible, to pay the $45,000. On the very next day Ludeling consented, contrary to Stubbs' expectation, to give the acquittance and he (Stubbs) was thereby enabled to get the money and effect the advance settlement, and found himself in a position to comply with the terms of his agreement with Gordon before his letter referred to had reached him.

When this was accomplished, we have seen that he left New Orleans prepared to pay the money to Gordon. That finding that he was dead, he paid the money to his legal representative, making, with the receipts and accounts delivered, the sum agreed on—$45,000.

It is, however, urged with great plausibility, that, even conceding the truth of the facts sworn to by defendant's witnesses, no contract or agreement affecting in any manner defendant's liability to Gordon's succession was established. That Stubbs never accepted Gordon's proposition, and that Gordon's death under any view of the matter avoided the contract or rendered it incomplete and inoperative.

From what we have already said on the subject of this agreement, it may be inferred that we do not so construe it. We understand the matter in this way:

Gordon believed, as did Stubbs and other creditors of the N. L. & T. R. R. Co., that from the judicial proceedings directed against the sole asset of the company—this judgment for betterments—their claims were greatly jeopardized, and if not totally lost, great delay must ensue before anything could be realized upon them; that their chances, in other words, were desperate unless the consequences of these measures then pending could in some way be avoided.

Influenced by these fears, Gordon was anxious to have a settlement out of court, an anxiety which was shared by those having a common

interest with him.   If effected at all, it had to be done before the 1st of March following, on which day the money had to be paid into court. Stubbs was trying to make arrangements to effect the settlement. Under the plan proposed and discussed by the interested parties, it could only be done by obtaining control of the claims of all the creditors against the road.   The amount due the creditors exceeded the amount of the fund.   It was essential to procure from the creditors abatements of their claims.   Some were more willing than others to make concessions and it was necessary to know what each creditor would abate to arrange the basis of settlement.

Gordon agreed to take $45,000 for his claim, if the settlement could be made.   He conveyed to Stubbs absolutely and finally, not the claim, but the privilege or option of taking it for $45,000 before the 1st of March.   The consideration was that Stubbs should at once proceed and endeavor to effect the settlement.   He did make the effort and did effect the settlement, and his right to settle with Gordon on the terms agreed on—$45,000—was complete and absolute.   The result of the efforts made and the settlement effected relieved Gordon from the impending or threatened total loss of his entire claim, and secured to him beyond contingency the $45,000.   The contract or agreement was perfect and complete between the parties when the understanding was had, that Stubbs was to give his time, labor and skill to accomplish the desired settlement, and Gordon consented that in the event of such a settlement Stubbs was to become the owner of his claim under the obligation to pay him therefor the price stated.   There was no further acceptance on either side necessary to the completion of the contract. Gordon made the proposition to convey the claim in the contingency contemplated for a stated amount, Stubbs accepted then and there the proposition, agreed to labor to bring about the desired result, did give his efforts, skill and time to that end—which Gordon could have compelled him to do—and did accomplish the object in view, and thereby and thereupon did become the owner of the claim in question, subject to the payment of the sum agreed on.

It is impossible to imagine after all this was done—after the consideration was performed and the settlement made that Gordon or his legal representative could withdraw from or repudiate the agreement—it was binding on both.   The proposition of Gordon was not, as contended, a *nudum pactum* revocable at his will and pleasure or avoided by his death.   It contemplated distinctly that Stubbs was to prosecute his efforts in bringing about the settlement and in procuring the neces-

sary advances of money to carry out the same, and that he was to have the right to count upon this agreement with Gordon as a factor in his negotiations in determining his ability to carry through and regulate the terms which he could afford to make with the other creditors.

These were valuable considerations, and when performed and fully executed upon the faith of Gordon's agreement—never withdrawn up to the final execution of said considerations—there exists no principle of law or equity upon which either Gordon or his legal representative could thereafter recede from the contract and deprive Stubbs of the benefit thereof.

In the case of Campbell vs. Lambert, recently decided but not yet reported, where we held an agreement to be a *nudum pactum* for want of mutuality of engagement, we said:

"If the consideration upon which defendant's promise was to take effect had been the doing of something by plaintiff involving labor or other value, and upon the faith of said promise and before its revelation the plaintiff had done the thing, *different principles* would apply not necessary to specify here."

The different principles referred to are thus expounded by Mr. Parsons in his work on contracts:

"Where one promises to see another paid if he will sell goods to another person, * * * the party making the promise is bound to nothing until the promisee within a reasonable time engages to do or else *does*, or begins to do, the thing which is the condition of the first promise. Until such engagement or such *doing*, the promisor may withdraw his promise, because there is no mutuality and, therefore, no consideration for it. * * * But if without any promise whatever the promisee does the thing required, then the promisor is bound on another ground. The thing done is itself a sufficient and complete consideration, and the original promise to do something if the other party would do something is a continuing promise until that other party does the thing required of him"—that is, if not seasonably revoked. Parsons on Contracts, p. 450. This disposes of the question of *nudum pactum*.

The French authorities and jurisprudence are to the same effect. Laromhiere, en 1 sur l'Art. 1138, No. 7; Laurent, Vol. 25, § 8, *et seq;* Marcadé, Vol. 6, p. 155, *et seq;* Mourlon, Vol. 3, § 488; Aubry and Rau, Vol. 4, p. 333; Troplong de la Vente, p. 122; Journal du Palais for 1877, p. 714; *Id.* 1872, p. 348; *Id.* 1869, p. 830; *Id.* 1866, p. 1020; *Id.* 1863, p. 92; *Id.* 1849, p. 393.

The only error in the verdict of the jury and judgment thereon is the small amount allowed the plaintiff. This was a palpable mistake, since the evidence leaves no doubt that the defendant was under no obligation to pay more than $45,000, and this amount he did pay.

It is, therefore, ordered, adjudged and decreed that the judgment of the lower court be annulled, avoided and reversed; and proceeding to render such judgment as should have been rendered, it is now ordered, adjudged and decreed that the demands of plaintiff be rejected at her costs in both courts.

## CONCURRING OPINION.

MANNING J. The stumbling block in the way of the defendant is his letter to McGuire of Feb. 11, 1880. If that is susceptible of explanation conformably to his defence, there will be no other difficulty in maintaining it, and the key to that explanation is the circumstances surrounding the parties at that time.

The business had reached a crisis. The prolonged negotiations had resulted in no definite arrangement, but an arrangement must be made, or all was lost. Time pressed. Further delay was ruin. Plan after plan had been devised, matured, and when on the eve of adoption and execution had been shivered into atoms by hindrances which were not foreseen, or if foreseen, could not be avoided or removed. The situation changed every day as rapidly as the shifting views of a kaleidoscope. Stubbs was in the thick of the fight, managing, arranging, negotiating, marshalling all his resources, and directing them. The struggle had been going on several weeks. The tension of mind consequent upon it was extreme. Anxiety devoured him. Apprehension of failure weighed upon him. Every thought, faculty, was absorbed by the impending danger, and was employed in finding means of escape. He was in a maelstrom which threatened to ingulf large interests.

In this perilous condition he wrote the letter—"if Gordon does not come, get him to consent to take $40,000 cash by 5th March which I will secure him abundantly, or $10,000 cash and balance not to exceed $35,000 within ninety days after 1st March. Get the best from him and let it be positive and in writing."

The effort was to get better terms than the optional contract. It is not inconsistent with the existence of that contract. When the optional contract was made, Stubbs had in view the advance settlement, and was trying to effect it. It had failed to all appearance, and he instantly

devised another scheme. 'The offer in the letter was a part of that scheme. But that was not an abandonment of the optional contract, much less does it prove that such contract never existed.

Besides, there is no evading the issue. That contract was made, or both Stubbs and Waddell have committed deliberate perjury. They swear to its existence point blank. Character, antecedents, must weigh. But put those considerations aside. What are the probabilities?

Gordon had looked upon his railroad interests as secure beyond peradventure. He had regarded the suit in the U. S. Court with complacent indifference. His companions in the venture, thoroughly well informed as he believed, laughed to scorn the attempt to disturb them. Then came the decree from Washington like an avalanche from the mountain-top, like a clap of thunder from out a clear sky. Alarm and dismay succeeded the sense of security. There was a complete revulsion of feeling. Instead of realizing from his investment, the loss of the whole of it stared him in the face. The judgment for betterments put him in heart. But if the other had failed, why not that? And very soon it looked certain it would fail. On one contingency alone was there any hope. He was weary of the strife. He longed for something sure. Absolute assurance was not to be had. An unconditional promise to give him a certain sum was out of the question. Nobody would have been wild enough to make such an offer. A contingent promise to pay was the utmost he could hope. He found Stubbs devising a scheme to save himself and his comrades along with him. The success of that scheme depended upon the assent of all. If he could find any one willing to promise him $45,000 payable on that contingency, and before 1st March, it opened a chance of escape. Stubbs was the only one who would be apt to entertain the proposition. It fitted in with his scheme. He offered it to him. Stubbs took the option of accepting it. The whole affair is probable and natural.

The scheme of advance settlement that had fallen through suddenly became practicable by the assent of Judge Ludeling, hitherto deemed impossible of attainment. That scheme was effected. Stubbs availed himself of the optional contract, and complied with it.

The decree is based on that. I concur in it.

### DISSENTING OPINION.

BERMUDEZ, C. J. The plaintiff having fully made out her claim and thereby fixed a liability on the defendant, it became incumbent upon him, under his pleas, to have established conclusively an exoneration.

Conceding the propositions of law for which he contends, it was his duty to have made his defense not only morally probable but legally certain, particularly under the circumstances like those presented in this controversy, in which the mouth of the only person who could have opposed contradiction is sealed in death. The evidence adduced at best makes the defense conjectural only.

I concur in the dissenting opinion of Mr. Justice Poché, which amplifies these views.

I think the plaintiff should recover.

## DISSENTING OPINION

POCHÉ, J.   I cannot concur with the opinion of the majority in this case.   I will, therefore, briefly state the reasons which led to my conclusions, without going over the whole ground of the controversy.

The case was fully argued before us in June, 1882.   I have since given a great deal of thought and serious study to the questions involved in it, with a sincere desire to reach a conclusion favorable to the defendant, who is known to me as a lawyer of great prominence and as a gentleman, because the main support of his defense is in his own testimony.   But I have as yet been unable to discard the impression created on my mind by two considerations which no testimony in the record can overcome, in my opinion.   In this, as in all cases resting on conflicting testimony and involving the existence or the construction of unwritten contracts, the safest guide in the judicial search for truth is in the conduct and acts of the interested parties, when the record affords any clue to either.

Now defendant's theory, on which he must stand or fall, is that on or about the 27th of January, 1880, Gordon had sold him his claim for $45,000, with the option on the defendant's part to accept or reject the offer by the first of March following.   It is conceded that the burden is on him to establish this contract with legal certainty.   Giving to his testimony and that of Waddell all possible weight, it must be admitted that to support a contract of such vast magnitude, and against a person who has since died, parol testimony is of the weakest kind, especially when the contract is alleged to have been made between men of intelligence and of great business tact and experience, with whom a few words of writing would have been of such great facility and of incalculable usefulness.   But does anything in Gordon's subsequent acts or conduct corroborate the belief that such a contract was entered into? The record shows nothing.   He died nineteen days afterward—on the

15th of February following—and he had in the meantime no other con-
versation or interview with the defendant.   The record shows that he
then entrusted the papers evidencing his claim to Judge Ludeling, his
friend and co-associate, giving him full authority to dispose of his
claim in the same way that Ludeling would dispose of his.   They met
for the last time on the 10th of February.   His previous instructions to
Ludeling were repeated and confirmed.   If he had sold his claim to
Stubbs, would he not have informed his trusted agent and friend of the
transaction?   The record shows that he was a practical business man,
and in giving his instructions to Ludeling he could not have failed to
instruct him that up to the 1st of March following, Stubbs had the
refusal of his claim for $45,000.

It is no answer to this argument to say that he feared Ludeling's op-
position to that scheme and that he did not dare so to inform him.   If
that fear had been the prompter of his action, he would not have placed
the papers in Ludeling's possession.   He would have handed them to
Stubbs himself, to whom they were in a measure indispensable, espe-
cially on the 14th of February, the day of his settlement with Ludeling,
to whom he was forced to make the promise in writing that he would
settle with Gordon " to his satisfaction."

This is the only light which the record affords of Gordon's conduct,
and it presents to my mind the first insurmountable obstacle to defend-
ant's success.

The second consideration, which in my opinion is a formidable obsta-
cle in defendant's path and is of itself entirely fatal to the whole theory,
is drawn from his own acts and is affirmed by his letter to J. F. Mc-
Guire, written only three days previous to the final settlement, which
reads as follows:

NEW ORLEANS, February 11, 1880.

J. F. McGuire—I telegraphed you last night to send Gordon by first
train, not expecting that you would receive it before the train left this
morning, and Gordon would come by Thursday's train, if not through,
at least to meet me at Jackson.   I sent for Ludeling yesterday, urging
him to come here without delay, as I am satisfied Campbell and others
are at work to force us to get the money through the court.   Ludeling
must come.   Send resolution of company authorizing settlement, etc.,
duly certified.   Send your claim and Raindolt's.   If the money has to
be paid into court our chance is gone, and we will not get stock, bonds
or money until all the harpies have satisfied themselves.   I want to
control all the debts I can.   If Gordon does not come down, get him to

consent to take $40,000 cash by 5th of March, for which I will secure him abundantly, or $10,000 cash, and balance,' not to exceed $35,000, within ninety days after 1st of March. Get the best you can from him, and let it be positive and in writing. From Endom and Baker, try and get a transfer of their claims for a discount of 25 per cent, to be paid by 3d of March, and authority to me to use them. Under no circumstances obligate me for any sum at less than 20 per cent discount. Send any and all claims I can use. Gordon's presence is not necessary if he will send the transfer and authority to use his notes. I send you form of transfer for Gordon, already signed, and you can fill up blank with amount. Please act very promptly, as we are surrounded with enemies on all sides. Yours, truly,

"FRANK P. STUBBS."

"Address me at St. Charles Hotel. Adopt same form for others as I have written for Gordon."

Every line of this letter teems with suggestions that at the date of its writing Stubbs had no contract, with or without option, with Gordon, for the purchase of his claim at a fixed price.

If he had the option to purchase Gordon's claim for $45,000, and the contract could be closed and made final by the simple power of his will, why should he ask that Gordon be sent to him?

If he had such a contract, why should he say to his agent that he could only dispense with Gordon's presence, if the latter *"would send the transfer and authority to use his notes,"* and that authority *"should be positive and in writing?"* Why use this language, if he knew and felt at the time that he had the option to use the notes by the mere act of his volition? If he had that option, why should he call on his agent to act promptly, as he was surrounded with enemies on all sides?

These considerations are not answered by the suggestion that this letter was simply an attempt to obtain the claim on more favorable terms, and that it does not necessarily exclude the position that he had the option to acquire it for $45,000. The agent is specially authorized to offer that identical sum, and on terms more onerous than those which he sets up in his answer, and which form the basis of the opinion of the majority of my brethren.

He authorizes an offer of $10,000 cash and the balance, as much as $35,000, *abundantly secured,* payable in ninety days. But the letter which is a full power of attorney to McGuire, goes still further, as is shown by the two following passages: " Get the best you can from

him (Gordon) and let it be positive and in writing." \* \* "*Under no circumstances obligate me for any sum at less than twenty per cent discount.*"

Now let us see to what extent his agent could have bound him to Gordon under this authority.

The least figure attributed to the amount of Gordon's claim or share in the judgment, in the record, is $60,000, and twenty per cent discount would have realized $48,000, or, $3000 in excess of the amount for which he had the option to acquire the whole claim.

No lawyer would attempt to maintain the proposition that Stubbs could have successfully resisted a compromise of $48,000 with Gordon, if such an agreement had been made between the latter and McGuire as Stubbs' attorney-in-fact. Is it probable or even possible, that holding a contract under which he was the owner at his option of Gordon's claim for $45,000, which he could pay with the funds realized from the judgment, he would have taken the chances of being bound through his agent to pay absolutely the sum of $48,000, and out of his own funds, for the same property?

My mind refuses to believe it, and I respectfully suggest, with all deference to my associates, that that consideration is the true pivot of the case, and is absolutely unanswerable.

Rehearing refused.